**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------
JPMORGAN CHASE BANK, N.A.,

                       Plaintiff,

   -against-

DIRECT GROUP LLC, DGI SERVICES LLC,
D.E. SHAW & CO., LP, SV INVESTMENT PARTNERS,
and DEAN TOPOLINSKI,

                       Defendants.
------------------------------------------------------------------------

Case No. 11 CV 0308 (WHP)(GWG)
ECF CASE

**COMPLAINT**

Plaintiff JPMorgan Chase Bank, N.A. ("Chase"), by and through its attorneys Stagg, Terenzi, Confusione & Wabnik, LLP, as and for its Complaint, alleges as follows:

**The Parties**

1. At all times hereinafter mentioned, Chase was and is a national banking association, federally chartered and existing under the laws of the United States, with its main office in the State of Ohio.

2. Upon information and belief, at all times hereinafter mentioned, defendant Direct Group LLC ("DG") was and is a Delaware limited liability company and has or had a principal place of business in the State of New Jersey.

3. Upon information and belief, at all times hereinafter mentioned, defendant DGI Services LLC ("DGI") was and is a limited liability company organized under the laws of the State of Delaware with a principal place of business at 100 Berkeley Drive, Swedesboro, New Jersey 08085.

4. Upon information and belief, some of DGI's largest clients are located in New York and DGI regularly solicits and contracts to perform services for New York companies. Moreover, DGI frequently subcontracts work to Mailmen, Inc., which is located in Islandia, New York. Accordingly, DGI is engaged in a continuous and systematic course of business within the state of New York.

5. Upon information and belief, at all times hereinafter mentioned, SV Investment Partners, LLC ("SVIP") a/k/a Schroder Ventures US, was and is a Delaware company with its main office at 505 Fifth Avenue, New York, New York 10017. SVIP is a private equity group which invested in DG.

6. Upon information and belief, at all times hereinafter mentioned, defendant D.E. Shaw & Co., L.P. a/k/a The D.E. Shaw Group a/k/a D.E. Shaw Direct Capital LLC was and is a limited partnership organized under the laws of the State of Delaware, with a principal place of business at 120 West 45th Street, New York, New York 10036. D.E. Shaw & Co., L.P.'s direct capital unit was and is, or was and is known as, Laminar Direct Capital L.P. a/k/a D.E. Shaw Laminar Portfolios LLC. Collectively, D.E. Shaw & Co., L.P., The D.E. Shaw Group, D.E. Shaw Direct Capital LLC, D.E. Shaw Laminar Portfolios LLC and Laminar Direct Capital L.P. are referred to herein as "D.E. Shaw." Upon information and belief, SVIP utilized D.E. Shaw as its debt facility to invest in DG.

7. Upon information and belief, at all times hereinafter mentioned, defendant Dean Topolinski ("Topolinski") was and is an individual residing at 15 Stockdale Crescent Richmond Hill Ontario, Canada.

8. Topolinski is an officer of DGI and controls the operations of DGI.

**Jurisdiction and Venue**

9. The amount in controversy exceeds $75,000, exclusive of interest and costs.

10. This Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. § 1332 by reason of the diversity of citizenship of the parties.

**Background**

11. In or about 2002, DG began performing direct mail services for Bank One, Corporation ("Bank One"). In July 2004, Bank One merged with and into JPMorgan Chase & Co. After the merger with Bank One, Chase continued to utilize DG for its mailing services.

12. On or about July 1, 2005, DG and Chase entered into a Master Procurement Agreement (the "Master Agreement") for DG to provide Chase with direct mail marketing services.

13. DG and Chase entered into Schedule One to the Master Agreement ("Schedule One") effective July 1, 2005 through June 30, 2008, which detailed the pricing, business requirements and other conditions for the direct mail services.

14. On or about July 3, 2008, DG and Chase entered into Amendment No. One to Schedule One of the Master Agreement (the "Amendment"), which extended the terms of the Master Agreement and Schedule One through September 30, 2008.

15. In or about September 2008, DG and Chase entered into Schedule Three to the Master Agreement ("Schedule Three"), which was and is effective July 1, 2008 through June 30, 2011 and detailed the pricing, business requirements and other conditions for the direct mail services to be provided by DG. The Master Agreement, Schedule One, the

Amendment, and Schedule Three are collectively referred to as the "Direct Mail Service Agreements."

16. Pursuant to the Master Agreement, New York state and federal courts have exclusive jurisdiction over any legal action related to the Direct Mail Services Agreements.

17. Under the Direct Mail Service Agreements, DG supplied Chase with a range of products and services related to direct mailings. These services included, but were not limited to, printing, brochure preparation, envelope preparation and insertion, postage payments, address sorting and transportation to local post offices.

18. The cost of the postage for the direct mailings was estimated separately from the cost of the DG services for each mail program and was paid separately and in advance by Chase to DG.

19. The cost of the postage depended on a number of variables, including but not limited to, the quantity and type of items sent, the addressees and geographical regions being delivered to, and promotions offered by the post office at the time of the mailing. Therefore, the exact cost of the postage for each direct mail program could only be calculated upon completion of the mailing.

20. In accordance with the industry standard, the postage funds paid to DG by Chase were segregated from other funds and held in a separate account maintained by DG at Yardville National Bankcorp ("Yardville"), which became PNC Financial Services Group in or about June 2007.

21. DG acted as Chase's escrow agent and fiduciary, holding Chase's postage funds for Chase's benefit in connection with the direct mail programs while the printing and

sorting services were performed, and then paid the United States Postal Service ("USPS") directly when the actual mailing took place.

22. Pursuant to the industry standard, DG was obligated to issue refund checks to Chase for excess postage within ten days of the mail job.

23. The industry standard was memorialized in Section 4(B) of Schedule One, which specifically provided that: "[DG] will reconcile postage funds provided by [Chase] to [DG] with daily usage reports . . . and other means. Postage reconciliation and postage refunding to [Chase] ("Refund Checks") are required within ten (10) Business Days of the Direct Mail job being shipped to the USPS."

24. Throughout 2005 and 2006, over the course of forty-four mail jobs, DG collected from and failed to return to Chase approximately $6,288,814.94 of Chase's unused postage funds, and retained these funds in a segregated account at Yardville exclusively for Chase's benefit.

**Chase's Unreturned Postage Funds Are Seized by DG**

25. SVIP acquired all or part of DG in or about 2004 and created a managing board to oversee DG's business operations. The "SVIP Board" was comprised of the following individuals: **Nick Somers**, Managing Partner and Co-Founder of SVIP; **Monty Yort**, Operations Partner at SVIP; **John Cochran**, Vice President at SVIP; **Andy Gaspar**, Co-Founder and Partner at SVIP; and **Manny Ortiz**, DG Founder and Chairman.

26. From 2004 through 2007, the SVIP Board made a number of poor financial investments for DG, including the acquisition of "Coupon Services" of Jersey City, New Jersey for $45 million and the acquisition of HintonHill, LLC of Frederick, Maryland in or

about 2006. The SVIP Board also made substantial capital expenditures and technology upgrade investments in DG.

27. In early 2008, SVIP renegotiated its debt facility and began utilizing D.E. Shaw as its investment bank.

28. D.E. Shaw replaced most of the SVIP executives on the board managing DG with D.E. Shaw's own executives. The new "D.E. Shaw Board" was comprised of the following individuals:

- Four D.E. Shaw executives: **Rob Ladd**, Managing Director of D.E. Shaw & Co. L.P. and President of D.E. Shaw Direct Capital LLC, **John W. Felix**, Senior Vice President of D.E. Shaw & Co. L.P. and a Director of D.E. Shaw Direct Capital, L.L.C., **Vivek Shaw**, Vice President of D.E. Shaw & Co. L.P.; and **Brandon Baer**, Senior Vice President of D.E. Shaw & Co. L.P.;

- Two DG officers: **Don Mckenzie**, Former Chief Executive Officer of DG, and **Jim Toohey**, Former Chief Financial Officer of DG; and

- Two independents: **Steven W. Corn**, Former Vice Chairman and Chief Operating Officer of CNN and **Robert "Kam" Kamerschen**, Former Chairman and Chief Executive Officer of ADVO, Inc.

29. In 2008, SVIP and the D.E. Shaw Board became increasingly concerned about the financial stability of DG and its ability to satisfy various covenants and loans and explored whether DG should file for bankruptcy.

30. D.E. Shaw sought to limit future losses and decided it would not invest any additional funds into DG, but that it would and did extend to DG a $10 million line of credit to keep the company afloat (the "D.E. Shaw Line of Credit").

31. Upon information and belief, DG never drew down on the D.E. Shaw Line of Credit. Instead, SVIP and the D.E. Shaw Board transferred Chase's unreturned postage funds from the segregated escrow account into a DG operating account without Chase's

knowledge or consent. In place of the $10 million D.E. Shaw Line of Credit, DG used Chase's unreturned postage funds to operate its business.

32. At all relevant times, defendants were aware of the improper use of Chase's unreturned postage funds to operate its business.

33. D.E. Shaw never advanced funds under the $10 million Line of Credit to DG. Instead, Chase's funds were used without Chase's knowledge as an interest-free *de facto* line of credit that was drawn on and depleted by defendants. Defendants substituted Chase's unreturned postage funds in place of the D.E. Shaw Line of Credit as a means to operate the company.

**An Anonymous Email Prompts An Audit of DG**

34. Upon information and belief, on April 8, 2008, at or about 8:30 p.m., an email was sent from the email address JohnZooda@philliesbleedred.com to a member of the D.E. Shaw Board, which read as follows:

> "[j]ust for your information, industry is starting to understand that DG is using postage to finance the company and the senior/executive management has been paying off the post office to get mail out on time. Once this leaks to the rest of industry and your customer base the damage could be irreversible."

35. Based upon the April 8, 2008 email, the D.E. Shaw Board held an emergency meeting on April 16, 2008, which resulted in the retention of the accounting and consulting firm J.H. Cohn, LLP ("J.H. Cohn") and law firm Morrison Cohen to conduct an audit and investigation of DG's books.

36. Upon information and belief, Morrison Cohen was aware of the misuse of Chase's postage funds to operate DG since early 2007 when a DG officer disclosed his concerns about DG's finances while negotiating his severance deal.

37. It took J.H. Cohn and Morrison Cohen approximately three to six months to complete the audit, which was finished in or about September 2008.

38. Upon information and belief, the audit revealed that DG had retained $6,288,814.94 of Chase's unused postage funds, transferred these funds into its operating account, and depleted the funds by using them to pay DG's obligations. The audit results were discussed verbally by the D.E. Shaw Board, which included D.E. Shaw representatives, but were never added to the board minutes or published.

39. Upon information and belief, in or about November 2008, in a desperate act to cover up its misdeeds, the D.E. Shaw Board passed a resolution declaring that no one had previously known about Chase's unreturned postage funds being misused by DG to operate the company. D.E. Shaw then put pressure on DG to immediately either sell the business or file for bankruptcy.

### D.E. Shaw Sells or Arranges for the Sale of DG's Assets

40. Upon information and belief, in late 2008, almost immediately after the D.E. Shaw Board resolution disavowing knowledge of Chase's misappropriated postage funds, D.E. Shaw hired the investment banking firm Petsky Prunier to locate potential buyers for DG. While D.E. Shaw searched for buyers, defendants continued to intentionally conceal from Chase DG's use and retention of Chase's unused postage funds.

41. In or about 2009, Topolinski and/or his assigns or representatives purchased DG and/or its assets and almost immediately sold or arranged for the sale of the fulfillment

8

and data division to Beringer Capital/Budco ("Budco").  Topolinski did not sell or arrange for the sale of the direct mailing division, which retained the DG name.  Upon information and belief, Budco is currently for sale and D.E. Shaw stands to make a substantial profit when Budco is sold.

42. Upon information and belief, Topolinski and/or his assigns or representatives paid approximately $3 million to D.E. Shaw for the purchase of DG and/or its assets, with the understanding that Topolinski and DGI would assume the obligation to repay Chase the approximately $6.3 million of unreturned postage funds.

**Chase Learns That DG Seized Its Postage Funds**

43. In January 2009, fearing it would become public that DG had retained and misappropriated Chase's postage funds, DG admitted to Chase that an audit revealed that it retained $6,288,814.94 of Chase's unused postage funds.

44. Chase responded by demanding an immediate refund of the full amount due.

45. DG advised Chase that it had completed a restructuring of the company, was under new ownership and that due to economic factors DG did not have the ability to give a full refund to Chase.  DG proposed a payment plan to reimburse Chase for the postage funds, which involved a 50% reduction of production costs up to $750,000 per fiscal quarter.  D.E. Shaw also proposed signing a promissory note for the full amount to be paid through the reduced production cost proposal.

46. In or about February 2009, Chase advised DG that it was also owed interest on the $6,288,814.94 of unreturned postage funds and reiterated that DG was in breach of the refund requirements in the parties' Direct Mail Service Agreements.

47. DG and Chase ultimately agreed that with interest, DG owed Chase a total of $7 million in unreturned postage funds.

48. D.E. Shaw represented to Chase that it would stand behind DG for repayment of the postage funds and that it would sign a promissory note guaranteeing repayment. D.E. Shaw later offered to place $1 million in escrow instead of a guarantee. DG advised that it hoped this would show Chase that D.E. Shaw had 'skin in the game' and was committed to reaching a fair and equitable resolution.

49. From January 2009 through October 2010, various letter agreements and escrow agreements setting forth the terms of repayment were drafted and exchanged between Chase, DG, DGI and D.E. Shaw, but never signed. Nonetheless, during this time, defendants advised Chase that they had conferred with DG and the D.E. Shaw Board responsible for DG, and agreed to issue Chase a credit for projects completed in January and February 2009.

50. Also during this time, defendants routinely performed direct mail services for Chase at a discounted rate of 50% up to $1 million per fiscal quarter.

51. In March 2010, defendants advised Chase that there was a new development and DG had agreed to combine with St. Joseph Communications Inc. ("St. Joseph"). DG assured Chase that the new relationship with St. Joseph would honor the parties' agreements and continue to produce work and issue credits.

52. Defendants ultimately reduced the amount they owed to Chase by approximately $3 million as follows:

| | |
|---|---|
| January - October 2009 | $656,133.66 |
| November 2009 | 321,037.58 |
| January 2010 | 71,453.98 |
| February 2010 | 124,616.03 |
| March 2010 | 245,779.59 |

|              |        |              |
|--------------|--------|--------------|
| April 2010     |        | 319,300.37   |
| May 2010       |        | 171,832.35   |
| June 2010      |        | 184,739.45   |
| July 2010      |        | 244,631.83   |
| August 2010    |        | 170,786.48   |
| September 2010 |        | 196,662.47   |
| October 2010   |        | 142,629.75   |
| November 2010  |        | 42,479.88    |
| December 2010  |        | 44,368.03    |
|              | **Total:** | **$2,936,451.45** |

### Topolinski Forms DGI Services, Inc.

53. On or about July 12, 2010, Jim Toohey, Chief Financial Officer of DGI, sent Chase a letter advising that substantially all of the assets of DG were sold by Century Services, LLC to DGI on April 28, 2010. DGI advised Chase that it intended to abide by the terms of the parties' agreement and requested that the Direct Mail Service Agreements be assigned from DG to DGI.

54. In or about September 2010, Topolinski fired the DG managing officers who had been negotiating and cooperating in the repayment of Chase's unreturned postage funds.

55. On or about October 14, 2010, at a meeting between Chase, DGI and Topolinski, DGI attempted to position itself as a separate entity from DG to avoid applying future credits or making payments to Chase in connection with the unreturned postage funds.

56. On October 18, 2010, Chase sent DG, D.E. Shaw and DGI a letter advising that after totaling the applied 50% reduction credits, approximately $4.6 million remained due and owing for unused postage funds pre-paid by Chase for direct mail services. Chase demanded that DG repay the amount due and owing.

57. On or about October 25, 2010, DGI and Topolinski denied assuming DG's obligation to refund Chase's unused postage funds. DGI also denied being affiliated with

11

DG and advised Chase that it would no longer honor its commitment to perform direct mail services at the 50% discounted rate, which had been used as a means of paying down defendants' obligation to refund Chase's unused postage funds.

58. Upon information and belief, Topolinski and certain defendants are marketing for sale the direct mailing business, which sale will yield millions of dollars in profit for defendants.

## AS AND FOR A FIRST CLAIM
### (Breach of Contract)

59. Chase repeats and realleges the allegations in the prior paragraphs.

60. Chase entered into the Direct Mail Service Agreements with DG, pursuant to which DG performed direct mail services for Chase.

61. By letter dated July 12, 2010, DGI requested that Chase assign DG's obligations under the parties' agreements to DGI.

62. Chase fully complied with the terms of the Agreements.

63. Defendants breached the Direct Mail Service Agreements by failing to return to Chase unused postage funds totaling approximately $4,063,548.56, paid in advance by Chase.

64. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

65. In addition, Chase is entitled to reimbursement of all reasonable attorneys' fees and costs (including court costs, disbursements and the cost of investigation, litigation and settlement) pursuant to Section 13.6 of the Master Agreement.

## AS AND FOR A SECOND CLAIM
### (Breach of Implied Contract)

66. Chase repeats and realleges the allegations in the prior paragraphs.

67. The conduct of Chase and DGI created an implied contract between the parties for DGI to perform direct mail services for Chase at a discounted rate to pay down the amount of money owed to Chase.

68. DGI performed under the implied contract by providing Chase with a discounted rate for services to pay down the amount owed.

69. Chase fully complied with its obligations under the parties' implied contract by providing direct mail assignments to DGI and paying for these services at the discounted rates.

70. DGI breached the implied contract by failing to continue to offer Chase the 50% reduction of production costs for mail jobs up to $1 million per fiscal quarter.

71. DGI breached the implied contract by failing to return to Chase the unused postage funds totaling approximately $4,063,548.56 paid in advance by Chase.

72. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

## AS AND FOR A THIRD CLAIM
### (Unjust Enrichment)

73. Chase repeats and realleges the allegations in the prior paragraphs.

74. Defendants benefited from retaining the $4,063,548.56 in unused postage funds.

75. Defendants did not give Chase consideration for the benefits they received.

76. Chase was entitled to receive a refund from defendants of all unused funds paid in advance for the cost of postage.

77. Despite Chase's repeated demands, defendants failed to refund approximately $4,063,548.56 of Chase's unused postage funds for the three programs.

78. Defendants knowingly retained Chase's postage funds and concealed the fact that the funds were due and owing to Chase.

79. As a result, defendants have been unjustly enriched and Chase demands in equity and good conscience that defendants reimburse Chase for the funds.

80. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH CLAIM
### (Conversion)

81. Chase repeats and realleges the allegations in the prior paragraphs.

82. Chase has a possessory interest in the $4,063,548.56 that defendants refuse to return to Chase.

83. By wrongfully retaining money belonging to Chase, defendants wrongfully exercised control and dominion over the aforementioned funds to which Chase was entitled and to which defendants were not entitled.

84. Defendants have failed to return the funds to Chase, despite demand.

85. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

86. Defendants intended and intend to cause Chase harm resulting from their conduct.

87. Defendants acted and are acting willfully and wantonly to cause that harm.

88. Accordingly, Chase is entitled to punitive damages against defendants in an amount to be determined at trial.

## AS AND FOR A FIFTH CLAIM
**(Tortious Interference)**

89. Chase repeats and realleges the allegations in the prior paragraphs.

90. SVIP and D.E. Shaw had knowledge of the existence of the Direct Mail Service Agreements between Chase and DG for direct mail services.

91. SVIP and D.E. Shaw had knowledge of the Direct Mail Service Agreements, including that refunds were owed to Chase for unused postage.

92. SVIP and D.E. Shaw intentionally induced DG to breach or otherwise render performance under the Direct Mail Service Agreements impossible.

93. Moreover, Topolinski had knowledge of the existence and the terms of the implied contract between Chase and DGI to provide direct mail services for Chase at a discounted rate of 50% up to $1 million per fiscal quarter until the unused postage funds were fully repaid.

94. Topolinski intentionally induced DGI to breach or otherwise render performance under the implied contract impossible.

95. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

## AS AND FOR A SIXTH CLAIM
**(Constructive Trust)**

96. Chase repeats and realleges the allegations in the prior paragraphs.

97. DG acted as an escrow agent for Chase's postage funds, and as an escrow agent, DG owed a fiduciary duty to Chase as the beneficiary of the unused postage funds.

98. DG promised to refund the unused postage funds.

99. Chase transferred postage funds to DG in reliance of DG's promise to refund unused funds.

100. Defendants failed to return the funds to Chase, despite demand.

101. As a result, defendants have been unjustly enriched and Chase demands in equity and good conscience that the Court impose a constructive trust.

102. As a result of the foregoing, Chase has been damaged in an amount to be determined at trial.

## AS AND FOR A SEVENTH CLAIM
### (Breach of Fiduciary Duty)

103. Chase repeats and realleges the allegations in the prior paragraphs.

104. DG owed Chase a fiduciary duty as Chase's escrow agent for the postage funds.

105. DG breached its fiduciary duty to Chase by transferring postage funds held for Chase's benefit out of the segregated account and into DG's operating account without Chase's knowledge or consent, and depleting the funds.

106. DG intended and intends to cause harm to Chase resulting from its conduct.

107. As a result of the foregoing, Chase has suffered damages in an amount to be determined at trial.

## AS AND FOR AN EIGHTH CLAIM
### (Fraudulent Conveyance)

108. Chase repeats and realleges the allegations in the prior paragraphs.

109. Upon information and belief, D.E. Shaw and DG conveyed or arranged to convey DG to Topolinski and DGI without fair consideration.

110. At the time of the conveyance, defendants knew DG owed Chase approximately $4,063,548.56 in unused postage.

111. D.E. Shaw and DG conveyed or arranged to convey DG to Topolinski and DGI with the fraudulent intent to avoid repaying Chase $4,063,548.56 in unused postage.

112. Moreover, upon information and belief, Topolinski and DGI sold the fulfillment and data division of DG to Budco without fair consideration.

113. At the time of the conveyance to Budco, defendants knew they owed Chase approximately $4,063,548.56 in unused postage.

114. Topolinski and DGI conveyed or arranged to convey the fulfillment and data division of DG to Budco with the fraudulent intent to avoid repaying Chase $4,063,548.56 in unused postage.

115. As a result of the foregoing, Chase has suffered damages in an amount to be determined at trial.

### AS AND FOR A NINTH CLAIM
(Conspiracy)

116. Chase repeats and realleges the allegations in the prior paragraphs.

117. Upon information and belief, in carrying out the conduct set forth above, including transferring and secreting Chase's unused postage funds, using Chase's unused postage funds to keep DG afloat, refusing to return the funds, and selling the DG companies in order to avoid repayment, defendants conspired and schemed to unlawfully and criminally deplete Chase's unused postage funds.

118. As a result of the foregoing, Chase has suffered damages in an amount to be determined at trial.

119. Defendants intended and intend to cause the harm resulting from their conduct.

120. Upon information and belief, defendants acted and are acting willfully and wantonly to cause that harm, which entitles Chase to punitive damages.

<b><u>AS AND FOR A TENTH CLAIM</u></b><br><b>(Accounting)</b>

121. Chase repeats and realleges the allegations in the prior paragraphs.

122. DG acted as escrow agent for Chase's postage funds and owed Chase a fiduciary duty.

123. DG maintained a segregated account for Chase.

124. Upon information and belief, Chase's funds were improperly transferred to defendants' operating accounts and depleted.

125. Defendants are wrongfully withholding funds that belonged to Chase.

126. Defendants have covered up the improper transfers and the wrongful withholding of funds.

127. Given the foregoing improper conduct, Chase is entitled to an accounting from defendants.

**WHEREFORE**, Chase demands judgment against defendants in an amount to be determined at trial, plus punitive damages, treble damages, specific performance, interest, attorney's fees, and the costs and disbursements incurred in this action.

Dated: Garden City, New York
January 14, 2011

        Yours, etc.,

        Stagg, Terenzi, Confusione & Wabnik, LLP

By: /s/ Thomas E. Stagg
     Thomas E. Stagg
     Debra L. Wabnik
     Haley E. Olam
     Attorneys for Plaintiff
     JPMorgan Chase Bank, N.A.
     **Office & P.O. Address:**
     401 Franklin Avenue, Suite 300
     Garden City, New York 11530
     (516) 812-4500
     (516) 812-4600 Fax